HISCOX & PEARCE *v.* ESBON SANFORD.

A grant by an owner of a mill privilege above, contained in a deed of quitclaim of his inter-
est in a privilege on the same stream below to his co-owner of the lower privilege, of " a
right to raise the water of the Annaquetucket River to the height of a hole in the rock at
the junction of said river with a river running from the Aaron Southwick lot," does not
authorize the grantee of the lower privilege to raise the water of the river *at his dam
below* to the height of the hole in the rock, but only to raise the water of the river to
the height of the hole *at the junction of the rivers above*, where the rock is situated.
Evidence that the dam below was, at the time of the grant, so high, that it raised the water
of the river, at the junction, *above* the hole in the rock, and of the acts, declarations, and
practice of the parties to the grant under it, not admissible to vary the above interpre-
tation.
*Qu.* As to the admissibility of evidence, that at the time of the grant the water of the
river, in its natural current, stood above the hole in the rock at the junction, to render
the grant so far ambiguous as to the point of the river which was to be raised to the
height of the hole, as to let in evidence of the acts and use of the water, under the
grant, by the parties to it, for the purpose of interpreting it.

THIS was an action of the case for flowing back water upon
the mill of the plaintiffs in North Kingston, by the mill-dam of
the defendant built across the Annaquetucket River, below the
mill of the plaintiffs; the declaration alleging the nuisance to
have been maintained between the 8th day of February, 1853,
and the 29th day of August, 1854.

Upon the trial of the case at a former term of this court,
under the general issue, before Brayton, J., it appeared that one
Joseph C. Sanford, being then owner of the mill of the plaintiffs
above, and with the defendant joint-owner of three tracts of
land on the river below, including the dam of the defendant, on
the 5th day of October, 1832, quit-claimed to the defendant his
interest in one of said tracts containing about 100 acres; and
in the same deed granted to the defendant " a right to raise the
water of the Annaquetucket River to the height of a hole in a
rock at the junction of said river with a river running from the
Aaron Southwick lot." Subsequently, by mesne conveyances
from Joseph C. Sanford, the plaintiffs became the owners of
the upper mill. ·

It being apparent that the water was, in general, during the
period covered by the declaration, higher, at the junction of the
two rivers, than the hole in the rock designated in the grant, it

was contended by the defendant that the fair construction of the grant was, that he was to be at liberty to maintain the water of the river *at his dam*, to the height of the hole in the rock, and was not restrained by the grant, as the plaintiffs construed it, from raising the water of the Annaquetucket *at the junction of the two rivers* above the hole in the rock there situated. He also offered evidence to prove, that at the time of the above grant, the water of the Annaquetucket was, in ordinary stages of that river, above the hole in the rock at the junction, and also to prove by the acts, declarations, and practice of the parties to the grant that their intent was to regulate by the hole in the rock the height at which the water of the river was to be maintained at the dam of the defendant below. The judge presiding at the trial, however, construed the grant as restraining the defendant from raising the water above the hole in the rock *at the junction;* and on the ground that it was wholly unambiguous in this respect, rejected the above evidence offered as in conflict with it.

The case then went to the jury upon the question whether the raising of the water above the hole in the rock and the flow upon the mill of the plaintiffs was caused by the dam of the defendant, or would not equally exist, without the dam, from the confined bed of the river compared with the water flowing in it; the evidence consisting in part of the testimony of Samuel B. Cushing, an hydraulic engineer, and partly of experiments conducted in the presence of the jury at the trial, on a view had by them of the premises. The jury upon the evidence found a verdict against the defendant for $50 damages; whereupon the defendant now moved for a new trial, on the ground, 1st, that the judge trying the cause had erred in construing the grant as restraining the defendant from raising the water of the river above the hole in the rock at the junction; 2d. that he had also erred in rejecting the evidence above stated to have been offered by the defendant; and 3d, upon the ground that the verdict was against evidence.

The motion was argued by *E. R. Potter* and *R. W. Greene* for the defendant, and by *W. Updike* and *N. F. Dixon* for the plaintiffs.

Hiscox & Pearce *v.* Sanford.

BRAYTON, J. On the 5th day of October, 1832, Joseph C. Sanford, then owning the mill-privilege above, on the same stream, by his deed of that date, conveyed to the defendant all his, the said Joseph C. Sanford's, interest below, and also granted to the defendant a right to flow, in these words : " Also a right to raise the waters of the Annaquetucket River to the height of a hole in a rock at the junction of said river with the river running from the Aaron Southwick lot."

At the trial, the defendant claimed under this deed a right to maintain the water at his dam below, to the level of the hole in the rock, irrespective of the height to which the water may thereby be raised at the rock. The plaintiff, on the other hand, insisted that upon the proper construction of the grant, it gave him the right only to raise the waters at the rock to a level with the hole, regardless of the height of the water at the dam or elsewhere.

The judge who presided at the trial ruled in favor of the plaintiff,—that the grant gave to the defendant the right to raise the waters to the level of the mark, but did not give him the right to raise them at any point higher than the mark ; and if by keeping the water at the dam to a level with the mark, the waters were raised at any point above the mark, the defendant would be liable for any injury caused thereby.

The first question is, whether this was the proper construction of the grant ? What then is the grant ? What did the parties intend to embrace as the subject-matter of it, by the language used in the deed ? Is there any ambiguity in it ? Are the terms used of doubtful meaning ? The language of this instrument seems to us sufficiently clear. That language is, " A right to raise the waters of the Annaquetucket River to the height of a hole in a rock at the junction of said river with the river running from the Aaron Southwick lot." The hole in the rock is clearly described, and there is no difficulty in ascertaining the mark which is to measure the height of the water. There is no difficulty in identifying it as the one referred to in the deed. The grant is to raise the waters of the river to the height of that hole. This was, of course, contemplated to be done by means of a dam below, though none is mentioned. It

is not a grant to raise the waters above the height designated, nor any portion of them above that height, but only up to it. If the defendant could maintain all the waters of the river at an exact level, his grant authorizes him so to do, and he would not be liable for any injury to the plaintiffs which might thereby be caused, provided that level was not above the mark. It is because by natural laws this cannot be done, that the construction of this grant is required to be made. If this could be done, it would not be material at what point on the stream his dam may be located, because, whether in one place or another, it would not affect the height of the water at any point on the grantor's premises. It is evident that if the water at the dam be raised to the height of this hole, the water at the hole will be raised above it, and the overflow (at the rock) will be proportioned in some degree, at least, to the distance of the dam or point of obstruction below the rock. This mark was intended to define the rights of the parties to the use of the waters of this stream,—to fix the height to which it might be raised by the defendant. It was of no importance to the grantor where the dam should be when the defendant should locate his mill, how high the dam should be, or how high the defendant should raise the water *upon his own land*, so that it was not raised upon the grantor's land above the point fixed by the deed. The material thing in the transaction was, how high it should flow upon the grantor ; and if the defendant was at liberty to place his dam where he pleased, as he clearly was, if the level intended was to be at the dam, the mark would not at all define the height of the flow, but would change with every change of location of the dam, and be at the election of the defendant. If placed further down stream, the overflow might be somewhat greater ; if further up stream it would probably be less, because the fall necessary to carry off the water would be less.

But it is said, a right to raise the waters of the. river must mean every portion of the waters, and therefore if the waters at the dam are not above the level of the mark, the defendant cannot be. answerable though the result may be to raise them at the rock above the mark. In this grant, the waters of the river are spoken of as a whole—the waters of the Annaquetucket

river. As a whole, they may be raised to that point. Nothing is said of parts or portions; and if instead of the terms "waters of the river," it had been simply "*river*," the import would not have been different. It is one body of water, running water, but not the less a body of water. When can it be said to be raised to a given level? It can be raised only by causing the water to flow back from the dam or point of obstruction. When raised, the surface, if there be a current, (as there must from necessity be in every running stream) the surface cannot be a perfect level. It must be inclined more or less. It must then be a body of water with its upper surface inclined from the point to which it flows back, downward toward the point of obstruction. Now if this were a solid body instead of a fluid, no question could arise as to when it had reached any given level. No one would hesitate to say that when any portion of the surface had reached the given point upwards, it had been raised to that level; and if carried higher, that it was above that level. We do not see that any greater effect can be given to the words in the case before us, simply because the subject is a body of water, and not a solid body, or that the means of raising it are different. The water is to be raised by flowing back and thereby raising the surface of the stream until that surface reaches the level of the hole in the rock. Having reached that point, the waters are raised up to it according to the grant. The language is tantamount to "a right to flow back the waters of the river until they reach the height of the hole," &c. Had the words, "and no higher," been inserted in the grant after the words, "to the height of the hole in the rock," &c., they would not add force to the words now used. It is a grant to raise to that height and no higher.

The words here used, it is said, are not technical, and have acquired no legal meaning, and their common practical meaning must be given to them; and their practical meaning is, to raise a pond for mill purposes; and the language tantamount to raising a pond for mill purposes to the height of the hole in the rock, and the term "pond" should not be understood to extend into the river or running water, but be confined to the still water. But is the meaning which we have given the language

any less practical? The pond to be raised is in the stream. It is the raising of the stream, or running water, that is to make the pond. Any sense in which the term, " pond for mill purposes," could be reasonably used, must include the entire extent of the water raised *for mill purposes*, and include the entire flow caused by the dam by which the pond is to be raised. The idea that it is not to extend into the river, is in conflict with the language used. The grant is, by its very terms, " to raise the *waters of the river*,"—to raise a running stream.

It was also said that the fact that said hole was made at the rock is not at all significant of the point at which the water was to be at the height of it, any more than if it had been made at a distance from the stream, and where the water could not reach it.

Had the mark been fixed by the parties at the dam, or at some other point near it, and where the water might flow against it, it might have been argued with some plausibility, at least, that the intent of the parties was that the height of the water at that point was that which was to be limited; and this would have been claimed as inferable from the fact that a mark fixed at that point would be of little practical service to ascertain its height elsewhere, and that it must have been fixed there that it might be seen at once upon simple inspection, and at all times, when the agreed height had been reached and when exceeded. But this implication is very much stronger when the mark is fixed up the stream to be raised, and at the extremity of the flow, where it may be ascertained at all times, upon inspection merely, when the water has reached that point towards the grantor's premises, to determine which, was the main purpose of fixing a mark at all. It was designed to fix a boundary, in fact, between the two privileges.

It was suggested, also, that it must have been, and was, the intent of the parties and of the grant, to give to the defendant all the water-power of the stream below, so as not to interfere with the grantor's privilege above, as it was then used. There may have been this general intent and understanding of the parties to the deed. But it is not necessarily inferable from the language of the grant, nor from the surrounding circumstances.

The grantor may have had it in contemplation for any thing expressed, or which appears *dehors,* to enlarge his privilege by sinking his wheel, as he afterwards did in fact, and to leave fall enough to carry off the water from his wheel, and have designed to keep down the defendant's pond, so as not to interfere with such enlargement. They may have used their best judgment, in order to determine the point to which the defendant might flow without injury to the grantor's mill, and fixed this point as the result of that judgment. This is probable. But the grant cannot be extended beyond what the language expresses, for any presumed intent of the parties, aside from that which is written. If flowing short of this mark would injure the grantor's mill, the defendant's right cannot therefore be restricted, and if flowing beyond would not affect the mill above, still the defendant's right cannot be extended.

The defendant claims, that notwithstanding the clearness and certainty of the grant upon the face of the deed, the judge ought to have considered the fact that the water at the rock, at the time of the grant, was above the mark referred to in the deed; and taking this fact in connection with the language, should have construed the grant as one to raise the water at the *dam* to the height, &c., because it must be presumed that something was intended to be granted which the grantee had not before.

This fact, as the defendant claims the fact to be, that the water was above the hole at the time the deed was executed, is required to be considered, if for any reason, because it clearly shows that the language of the deed was used in other than its ordinary sense, and the sense in which such language is usually understood, and therefore denotes a different subject from that which, using it in that ordinary and usual sense, it would designate. And in this case the defendant claims that although this language, supposing the flow to have been below the mark, may and does properly mean to flow back till it reaches the mark, yet that if the water was then above it, the language does not mean a flow back, but a raising of the water at a particular point on the stream, viz: the dam.

Now, facts surrounding a transaction may show that the parties meant to convey what is not included in the deed, as to

convey Black Acre, which is not described in it. But in such case Black Acre cannot be inserted and the grant construed as if it were described. It shows only that the parties have not expressed by the deed what was intended to be expressed.

And in this case, if it were clear that the parties intended to grant a right to raise the water at the dam to the height mentioned, instead of a right to flow back to that height, it would not then follow that the words "at the dam" were to be inserted, or the deed construed as if those words were inserted. We cannot look to the general intent of the parties for the purpose of construing a written instrument; but if this general intent be all that the surrounding facts show, it must be rejected, and the grant contsrued still by its own terms. It is only where such fact shows that the language used by the parties was not used by them in its usual and ordinary sense, but in a more restricted one, as it may sometimes be, or in a more general sense, as it may be in other cases, but nevertheless in a sense in which such language has been heretofore sometimes used, that such facts are admitted to influence the construction. It is then admitted to discover the intention of the parties by explaining things or persons denoted by doubtful expressions to show the sense and definition of the words used. Such evidence can never be received to supersede the written language, to supply any defect in it, or to add other words.

The fact that the water was above the mark at that point, does not show that the language here used has acquired any distinct, special, or peculiar meaning, different from that which we have given to it, viz : a right to flow back the water to the height designated. It may show that something less passes by the grant than the parties at the time supposed, but it does not show that the height of the flow was not that which was intended to be limited by the mark, and that the mark was intended to limit the height of the water at a point below not designated. Such construction would require, we think, an interpolation, after the words "waters of the river," of the words "at the dam;" and to make the grant definite, the further words "where it now is." In applying the language of the deed, we are to look for the highest point of the flow of water, wherever

Hiscox & Pearce *v.* Sanford.

that may be, and when found, compare it with the level at the mark.

But it is suggested that something was intended to be granted, and that it is necessary to give effect to the deed that the height of the water at the dam should be regarded, and that only. This does not seem to us necessary. If it were true that the defendant could not flow at all upon the grantor's land, that the river flowed at all places upon his land above the level of this mark, then would the suggestion have more weight. This does not appear. He may flow the grantor's land under this grant, and that without being compelled to resort to the lowest point of raising, viz: the dam, as correspondent to the hole in the rock, instead of to the highest point, which we think from the language was clearly intended.

The third ground for new trial alleged, is, that the evidence offered by the defendant of the acts of the parties to the deed, immediately after, and for some years subsequent to the grant, in keeping the water at defendant's dam at the height of the hole in the rock, and offered for the purpose of showing the practical construction put upon the grant by the parties to it, was ruled out.

Where the proper construction of written instruments is doubtful, where the language is ambiguous, where it is uncertain in what sense particular terms or expressions are used by the parties, evidence of this kind is often admitted with great benefit and to the advancement of justice. But where there is no such difficulty, where the language is reasonably clear, and the court can without difficulty ascertain the intent of the parties from the language used in the instrument itself, such evidence is never admitted. And as we do not consider the construction of the grant in this case doubtful, but, on the contrary, sufficiently clear, we are not warranted in travelling out of the language of the instrument itself to ascertain any different intent of the parties.

In regard to the last ground of new trial alleged, to wit, that the verdict is against evidence, we are all satisfied, that upon the evidence submitted to the jury, their verdict ought not to be disturbed.

AMES, C. J., concurred in the opinion of the court as to the interpretation of the grant in question, looking merely at the terms in which it was expressed, and such evidence, as to the subject to which it was applied, as had been submitted to the jury; but added, that if, as he understood from the grounds of new trial allowed by the judge who présided when the case was before a jury, the offer of the defendant was to show by evidence that the water of the Annaquetucket River, in its ordinary stages, and unaffected by the dam, stood at the time of the grant, at and above the height of the hole in the rock *at the junction,* such evidence should, in his judgment, have been allowed to pass to the jury. It would certainly, as the grant must be supposed to have granted something, have favored the construction claimed for it by the defendant; and, in his judgment, have rendered it so far ambiguous, that evidence, coming from the acts and use of the water by the parties under the grant, also offered by the defendant and rejected, should have been let in to interpret it. *New trial denied.*